## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| J.H.,<br><br>　　Plaintiff,<br><br>v.<br><br>EMBRY VILLAGES S.C., LLC; CT HOTELS, LLC; *and* DIPLOMAT CT HOTELS, LLC,<br><br>　　Defendants. | CIVIL ACTION FILE<br>NO. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

1.

J.H. is a victim of sex trafficking at the Motel 6 formerly located at 3585 Chamblee Tucker Road, Atlanta, Georgia ("Motel 6"). In 2015, J.H. was sold for sex at the motel beginning when she was a child of only 14 years old. Given the nature of the case, Plaintiff is identified in this Complaint by her initials. Plaintiff's counsel will disclose her full name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

---

[1] Contemporaneously with this Complaint, Plaintiff files a Motion for Protective Order and Leave to Proceed Anonymously because the allegations in the Complaint, which include child sex trafficking, are intimate and personal in nature and raise concerns for Plaintiff's own personal safety.

2.

Defendant Embry Villages S.C., LLC, is a foreign limited liability company organized under the laws of the State of Delaware with its principal place of business located at 500 North Broadway, Suite 201, Jericho, New York, 11753. Said Defendant is authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: CT Corporation System, 289 S Culver St, Lawrenceville, Georgia, 30046-4805.

3.

Defendant CT Hotels, LLC, is a domestic limited liability company organized under the laws of the State of Georgia with its principal place of business formerly located at 3585 Chamblee Tucker Road, Atlanta, Georgia 30341. Said Defendant was at all relevant times authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent, Bryan M. Knight, 1360 Peachtree Street NE, Suite 1201, Atlanta, GA 30309, or as otherwise authorized by law.

4.

Defendant Diplomat CT Hotels, LLC, is a domestic limited liability company organized under the laws of the State of Georgia with its principal place of business formerly located at 3585 Chamblee Tucker Road, Atlanta, Georgia 30341. Said

Defendant was at all relevant times authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent, Bryan M. Knight, 1360 Peachtree Street NE, Suite 1201, Atlanta, GA 30309, or as otherwise authorized by law.

5.

Defendants Embry Villages S.C., LLC, CT Hotels, LLC, and Diplomat CT Hotels, LLC, have been properly served with process in this action.

6.

Jurisdiction and venue are proper as to Defendants.

7.

Defendants knew that sex trafficking and prostitution were rampant at the Motel 6 for years—before, during, and after Plaintiff's trafficking. Each Defendant knew because:

    a. Defendants knew about Plaintiff while she was sold for sex at the Motel 6;

    b. Each Defendant's employees knew of, permitted, or observed signs of sex trafficking and prostitution at the Motel 6;

    c. Defendants knew about several other sex trafficking victims at the Motel 6 before, during, and after Plaintiff was sold for sex there;

3

d. Defendants knew about criminal activity occurring at the Motel 6 that is commonly associated with sex trafficking;

e. Defendants knew the motel was a central hub for sex trafficking of minors because it was the subject of a documentary during which a sex-trafficked minor was rescued at the Motel 6;

f. Defendants knew about reports of Motel 6 guests regarding sex trafficking and prostitution-related activities; and

g. Defendants had knowledge of sex trafficking in the Atlanta area generally and at the Motel 6 specifically.

8.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Georgia law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under § 1591(a)(1).

9.

Sex trafficking and prostitution were common occurrences at the Motel 6. Each Defendant chose to ignore, allow, condone, facilitate, support, or permit such

4

activity at the motel. Each Defendant is liable to Plaintiff for its actions and failures to act. Each Defendant's liability to Plaintiff is straightforward:

a. The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person *knew or should have known* has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a) (emphasis added). Each Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the motel, a common undertaking involving risk and potential profit, Defendants, individually or in concert, (i) rented a room, and provided other products or services in exchange for money or things of value, to Plaintiff's trafficker so Plaintiff could be violently sold for sex at the motel on multiple occasions, and (ii) did so despite what they knew or should have known about Plaintiff being a victim of sex trafficking during the course of the room rental  or other transactions. As a result of each Defendant's acts and failures to act, Plaintiff suffered physical and

mental harms, and Defendants are liable to Plaintiff for the damages arising from those harms under the TVPRA.

b. The Motel 6 facilitated, condoned, or participated in Plaintiff's false imprisonment by her traffickers. Among other things, the Motel 6 staff created an unsafe environment where dangerous criminal activity was permitted and created a real and substantial barrier to Plaintiff's freedom of movement while at the Motel 6.

c. The Motel 6 constituted a public nuisance under Georgia law because the motel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the motel, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous, illegal activity. As a direct result of this nuisance, Plaintiff was sold for sex at the Motel 6, causing her substantial harm.

d. Because Plaintiff was a child when she was trafficked at the Motel 6, and because Defendants knowingly benefitted from or otherwise facilitated her trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to Plaintiff for the substantive violation of 18 U.S.C. § 1591.

10.

Whenever reference is made in this Complaint to any act, deed, or conduct of one or more Defendant or the subject company/property, the allegation is that the

Defendant or subject company/property engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendants at the Motel 6 and at all relevant times were acting within the course and scope of such persons relationship with Defendants.

## I.    J.H.'s trafficking at the Motel 6.

11.

In or around May 2013, beginning when she was only 14 years old, J.H. was sold for sex multiple times at the Motel 6. She was sold multiple times from 2013 to approximately 2015. The Motel 6 was also the place J.H. was rescued from the life of sex trafficking. At all times while she was being trafficked, J.H.'s young age was apparent to anyone who encountered or observed her.

12.

J.H. was first taken to the Motel 6 by a pimp (trafficker) and kept in a motel room at the Motel 6 for about a week at a time where she was sold for sex. She was then moved to another hotel only to return for another week at the Motel 6 to be sold for sex again. J.H. was sold for sex to multiple buyers during each stint at the Motel 6 from 2013 through 2015.

13.

As is common when girls are sold for sex, they require an inordinate amount of towels and related supplies to clean themselves between each of the sexual encounters. Motel 6 housekeeping staff, as well as front desk staff, brought extra towels and linens at J.H.'s trafficker's request to the room where J.H. was being sold for sex. The motel thereby facilitated J.H.'s trafficking by bringing extra supplies for use by J.H., as well as the traffickers who sold, and buyers who bought, J.H. for sex.

14.

Motel 6 staff had access to and regularly entered the room where J.H. was sold for sex so they could clean and service the room. Each time they did, staff would or should have observed signs that J.H. was being sold for sex, like a dozen or more used condoms in trash cans. They would also have observed J.H. on a bed, dressed half-naked and in clothing and makeup typical of girls being sold for sex, like fishnet, lingerie, shear fabric, booty shorts, a bra with no shirt, and similar outfits that revealed or barely covered her naked body.

15.

Staff were familiar with J.H.'s trafficker and knew he rented the room where J.H. was being sold for sex. The staff interacted with and spoke to J.H.'s trafficker

in the room and around the motel property on multiple occasions, including while servicing the room where J.H. was being sold for sex.

16.

While being sold for sex at the Motel 6, J.H. was beaten by her trafficker as a means of control and domination. The assaults left wounds and visible injuries, like cuts and bruises, that she couldn't hide, even with makeup. These injuries were apparent to anyone who saw her.

17.

Motel 6 staff knew, or should have known, that J.H.'s trafficker was the one that assaulted J.H. Motel 6 staff never asked questions about J.H.'s well-being, reported her injuries or likely assaults, or otherwise tried to help J.H. or intervene in the obviously illegal and dangerous activity in the room where J.H. was being sold for sex.

18.

Front desk staff knew or should have known J.H. was a minor who was being sold for sex.

19.

J.H.'s trafficker would send her to do things for him at the Motel 6. He would send her to the front desk with cash to pay for the room where she was being sold for sex.

20.

J.H. would also regularly purchase condoms from the front desk to use during sexual encounters with men who bought her, sometimes multiple times per day. Staff interacted with her during these transactions. From her clothing, demeanor, young age, and recurring purchase of condoms motel staff knew, or should have known, she was being sold for sex in the room that they also knew she was occupying. The motel furthered J.H.'s trafficking by selling condoms to her when they knew, or should have known, that J.H. was being sold for sex as a minor at the motel.

21.

When J.H. required more condoms than the motel sold at one time, she would walk past the front desk to buy condoms from the nearby Kroger where she could buy them by the box. She would bring the boxes of condoms back, sometimes without a bag. Anyone could see the box(es) she carried into the motel and, often, staff interacted with her while she was openly carrying boxes of condoms back to her room. A young girl making repeated, bulk purchase of condoms was just another day at the Motel 6.

22.

Motel 6 staff knew or should have known that J.H. was a minor not only because of how young she looked but also because she was not old enough to rent a room in her own name. When J.H.'s trafficker needed her to rent the room for him,

Motel 6 staff made that happen. They knew she didn't have an ID and knew, or should have known, she wasn't old enough to rent the room herself. So, they sent her to find anyone with an ID so they could rent the room to her using another person's ID. They did not care whose ID she used or that she was not old enough to rent a room in her own name. They would even tell her to ask a random person in the parking lot for their ID. Hotel staff knew that J.H. was obtaining the room so that her trafficker could continue to sell her for sex at the Motel 6. This occurred on multiple occasions while J.H. was trafficked at the Motel 6.

23.

Whenever J.H. was outside her room in the motel hallways or office area, or otherwise interacting the motel staff, she was dressed in skimpy clothing apparent to anyone that she encountered that she was being sold for sex.

24.

Over the course of a year or more while being sold for sex at Motel 6, J.H. had numerous interactions, including the foregoing, with motel staff. The staff knew J.H. and knew or should have known that she was a minor who was being sold for sex at the motel.

25.

Pimps hung around the hotel property while the girls they sold were having sex with buyers. The girls were dressed in clothing and makeup typical for girls

being sold for sex. So dressed, they would walk out in the open and bring cash to their pimps where they loitered around the motel or in the parking lot. J.H. was one of those girls and, after a date, she would often bring her trafficker the money. Like the other women, J.H. was dressed in clothing and makeup commonly associated with girls being sold for commercial sex.

26.

The Motel 6 was hopping with commercial sex activity. J.H. was forced to have sex with as many as 25 dates a day while she was being trafficked at the Motel 6 over the course of a year or more. There were around 10-15 other girls being sold for sex, too, including other girls under 18 years old.

27.

On a given day a hundred or more buyers of sex would come and go from the Motel 6. These buyers would arrive and leave after 30 minutes to an hour in a room with J.H. or another girl who was being sold for sex. The buyers' coming and going was obvious. The girls being sold for sex would move between rooms in skimpy and revealing clothing, traversing the hallways and other common areas so they could get to the rooms where the dates would meet them. These dates—male, unregistered guests—would follow the girls or enter the rooms where the girls were waiting. All of this obvious commercial sex activity was visible to motel staff who were on the property or anyone else on the property.

12

28.

The Motel 6 frequently rented multiple rooms to a single trafficker, each of which would be used for a short duration by a male who was not a registered guest.

29.

Motel 6 had a policy or practice of encouraging patrons not to involve law enforcement when things happened on the property, especially commercial sex. Motel 6 employees implemented this policy or practice as to J.H. and her traffickers by taking efforts to prevent police or minimize the signs of commercial sex activity.

30.

The Motel 6 had a policy or practice of placing girls being sold for sex in rooms located in areas of the motel that minimized detection by police or outside observers. These rooms usually provided a better lookout for law enforcement or others who might detect or report the trafficking. These rooms were located on a back or more-secluded portions of the motel. Motel 6 implemented this policy as to J.H. by providing her trafficker rooms in these areas.

31.

Motel 6 protected J.H.'s trafficker and prolonged J.H.'s trafficking at the motel. On at least one occasion, J.H.'s traffickers and another victim had an altercation. The police were called. The motel staff told J.H.'s traffickers to leave and take J.H. with her while the police were there. The staff did not report the

obvious illegal sex trafficking, but instead simply wanted J.H. and her traffickers off the property because they were drawing unwanted attention to the motel and, potentially, the illegal commercial sex activity, including J.H.'s trafficking. After things calmed down, the Motel 6 welcomed J.H.'s trafficker back along with J.H. so that the motel could continue to profit from renting rooms to J.H.'s trafficker and, thereby, profit from the repeated and continuing sale of J.H. and other young girls for sex at the motel.

32.

J.H. was eventually rescued from the Motel 6 in or around 2015.

## II.   Each Defendant's knowledge of crime at the Motel 6.

33.

The Motel 6 had a well-established reputation for criminal activity, including prostitution and sex trafficking.

34.

Defendants, individually or in concert, owned and operated the Motel 6 and employed the employees who worked there, giving them specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the motel during the period of Defendants' ownership and/or operation of the motel.

35.

Before, during, and after Plaintiff's child sex trafficking at the Motel 6 prostitution, sex trafficking, and child sex trafficking, were rampant, frequent occurrences at the motel that were obvious or otherwise known to employees and guests.

36.

The Motel 6 was infamously featured in a documentary about child sex trafficking in Atlanta produced by CNN and hosted by Jada Pinkett Smith called, "Children for Sale," which aired in July 2015. The documentary features live video of law enforcement rescuing children who, like J.H., were victims of sex trafficking from motels, including the Motel 6.

37.

During the CNN documentary, DeKalb County police officers rescued a 17-year-old girl who was being sold for sex at the Motel 6 in or before 2015. Below is a screenshot of the Motel 6 during the operation featured during the documentary.



38.

Motel 6 was one of several hotels/motels in the metro Atlanta area known for its role as a hub for illegal sex trafficking operations, along with other hotels and motels with similar reputations for permitting rampant sex trafficking on their properties.

39.

The Motel 6 was reported as the property where one or more convicted child predators and abusers operated an illegal sex trafficking ring to sell girls, including minors, for sex at the motel.

16

40.

The Motel 6 was also reported as a location where women being sold for sex were violently assaulted and abused.

41.

Upon information and belief, the Motel 6 was permanently closed and eventually demolished in or around 2016 bringing to close the rampant criminal, illegal, and dangerous activity on the property, including child sex trafficking.

III.   **Each Defendant's knowledge of sex trafficking generally.**

42.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

43.

Defendants knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Motel 6. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings

of roughly $33,000.[2] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Each Defendant benefited from some of those illicit profits by rental rates paid for the motel rooms used for the trafficking of Plaintiff.

44.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[3] and as "the number one city for child sex trafficking."[4]

45.

Defendants knew or should have known that motels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they

---

[2] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable,* Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Jan. 3, 2026); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30-32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Jan. 3, 2026).

[3] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Jan. 3, 2026).

[4] *Id.*

have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

46.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving motels and hotels were sex trafficking cases, and another 2.6 percent reported a combination of sex and labor trafficking.[5] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[6] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[7] Unfortunately,

---

[5] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://traffickinginstute.org/wp-content/uploads/2024/06/2023-2023-Federal-Human-Trafficking-Report-WEB-Spreads-LR.pdf (last visited Jan. 6, 2026).

[6] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https.www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

[7] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Jan. 3, 2026).

"94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[8]

47.

Defendants knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[9] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[10]

48.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[11]

---

[8] *Id.* at 23.

[9] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality*
*Industry* 6 (presentation at AHIA Sprint Conference 2013), https://web.archive. org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/ getfile/92983.

[10] *Id.* at 19.

[11] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Jan. 3, 2026).

49.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

a. establish corporate policy and procedures against sexual exploitation of children;

b. train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

c. include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

d. provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e. support, collaborate, and engage stakeholders in the prevention of sexual exploitation of children; and

f. report annually on the company's implementation of Code-related activities.

21

50.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking.

51.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hospitality personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

    a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

    b. persons who lack freedom of movement or are constantly monitored;

    c. persons who have no control over or possession of money or ID;

    d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

    e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

f.  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.  extended stay with few or no personal possessions in the room;

h.  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.  the same person reserves multiple rooms;

j.  a room is rented hourly, less than a day, or for an atypical extended stay;

k.  attempts to sell items to or beg from patrons or staff;

l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons;

n.  waiting at a table or bar and picked up by a male (trafficker or customer);

o.  persons asking staff or patrons for food or money; and

p.  persons taking cash or receipts left on tables.

### 52.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and peddle sex—sex trafficking would cease to exist. In

23

Plaintiff's case, the Motel 6, for a fee, provided this market for Plaintiff to be confined and sold.

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

53.

Plaintiff incorporates the foregoing and all following allegations as if fully restated herein.

54.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), each Defendant knowingly benefitted from participation in a venture that each Defendant knew or should have known engaged in acts in violation of the TVPRA.

55.

Each Defendant knowingly benefitted by receiving revenue generated by the operation of the Motel 6, including the revenue generated for the room in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Motel 6, each Defendant knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room-rental fees and other concessions.

56.

Defendants' operation of the Motel 6 constituted a venture.

24

57.

Each Defendant participated in a hotel/motel venture and knew or should have known that the operation of the motel violated the TVPRA by harboring and falsely imprisoning Plaintiff so that Plaintiff could be sold for sex as a minor at the Motel 6. Each Defendant knew or should have known Plaintiff was illegally being sold for sex at the motel.

58.

Each Defendant also participated in a venture involving Plaintiff's sex trafficker. The rental of rooms for profit to Plaintiff's sex trafficker, rooms in which Plaintiff and others were illegally sold for sex, also constituted a venture under the TVPRA.

59.

Each Defendant's harboring Plaintiff at the Motel 6 as part of her sex trafficking constituted false imprisonment. At times, Plaintiff's false imprisonment at the Motel 6 was independent of any other aspect of her trafficking, such as sexual encounters, assaults, or batteries she may have endured.

60.

Each Defendant's conduct, and each and all ventures in which Defendants participated, utilized the channels and instrumentalities of, or otherwise affected,

interstate or foreign commerce, among others including highways and interstates, vehicles traveling and sold in, goods and services, advertisement, and the internet.

61.

Each Defendant knew or should have known the venture in which it participated had engaged in one or more acts in violation of the TVPRA because each Defendant's agents, employees, and representatives participated in Plaintiff's child sex trafficking at the Motel 6. Each Defendant knew or should have known of this participation.

62.

Each Defendant also knew or should have known the venture in which it participated had engaged in acts in violation of the TVPRA because each Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Motel 6.

63.

Each Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of its agents and representatives.

64.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of each Defendant's knowing benefit from participation in the ventures as alleged herein.

26

65.

Each Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595.

66.

Thus, as described herein, Defendants are each and all jointly and severally liable to Plaintiff for damages arising from the indivisible injuries to Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## COUNT II
## NUISANCE

67.

Plaintiff incorporates the foregoing and all following allegations as if fully restated herein.

68.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance.  The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

69.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

70.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual.  However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

71.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

72.

The Motel 6's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

73.

The Motel 6 caused or contributed to a blighting effect on the surrounding community, so that the Motel 6 negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Motel 6, although the effects on each person may have varied.

74.

The illegal prostitution and sex trafficking nuisance occurring at the Motel 6 had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and tended to breed crime and debauch the morals of the community. The harmful effects of the nuisance continue to harm the public to this day.

75.

The acts and omissions of each Defendant in permitting prostitution and sex trafficking at the Motel 6 caused special damages to Plaintiff, as she was the victim of child sex trafficking at Defendants' nuisance motel and suffered damages to her

29

health, including mental and emotional harm, pain and suffering, and each Defendant is liable to Plaintiff for all such damages.

## Public Nuisance *Per Se*

76.

The Motel 6 constituted a statutory nuisance *per se* under Georgia law because each Defendant knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the Motel 6 including sex trafficking.

77.

A business where illegal practices are permitted constitutes a nuisance.

78.

A business, like the Motel 6, that allows prostitution and sex trafficking is a *per se* public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

79.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Motel 6 that permitted illegal sexual activity to occur there.

80.

Each Defendant is liable for nuisance (public nuisance and/or *per se* public nuisance) by reason of its failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious

condition and of which Defendants has express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## COUNT III
## STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255

81.

Plaintiff incorporates the foregoing and all following allegations as if fully restated herein.

82.

Plaintiff was under the age of 18 when she was trafficked at the Motel 6 on one or more occasions.

83.

Plaintiff was a victim of one or more violations of 18 U.S.C. § 1591 at the Motel 6.

84.

As described above, Defendants directly participated in the child sex trafficking of Plaintiff by knowingly assisting and facilitating Plaintiff's sex trafficking at the Motel 6 because each Defendant's employees openly participated in Plaintiff's trafficking, *supra* ¶¶ 7-41. Thus, Defendants committed the predicate offense of a violation of 18 U.S.C. § 1591 as to Plaintiff.

85.

Plaintiff suffered personal injury as a result of each Defendant's violations of

31

18 U.S.C. § 1591 and 18 U.S.C. § 2255.

86.

Thus, as described herein, each Defendant is jointly and severally liable to Plaintiff for compensatory and punitive damages, in an amount to be determined at trial.

**DAMAGES**

87.

Plaintiff incorporates the foregoing and all following allegations as if fully restated herein.

88.

As a proximate and foreseeable result of each Defendant's violations of the TVPRA and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a.  Personal injuries;

b.  Past, present and future conscious pain and suffering;

c.  Loss of enjoyment of life;

d.  Mental anguish and emotional distress;

e.  Incidental expenses;

f.  All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

g.  Consequential damages to be proven at trial.

89.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

90.

Each Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled

to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

***

**WHEREFORE**, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

a. Process issue as provided by law;

b. Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants jointly and severally or as otherwise allowed by law;

c. Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants jointly and severally or as otherwise allowed by law;

d. Plaintiff be awarded a trial by jury; and

e. Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

**TRIAL BY JURY IS HEREBY DEMANDED**.

[<em>Signature on following page.</em>]

34

Respectfully submitted on March 16, 2026.

ANDERSEN, TATE & CARR, P.C.

/s/ Stephen Morrison

STEPHEN D. MORRISON, III
Georgia Bar No. 700828
smorrison@atclawfirm.com
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

/s/ Stephen Morrison

STEPHEN D. MORRISON, III
Georgia Bar No. 700828
smorrison@atclawfirm.com
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile